IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

KIMBERLY BROWN                                                    PLAINTIFF

v.                              Case No. 4:12-cv-164 KGB

CHARLES "DOC" HOLLADAY, et al.                                   DEFENDANTS

OPINION AND ORDER

Plaintiff Kimberly Brown brings this action pursuant to 42 U.S.C. § 1983 and the
Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 et seq. ("ACRA").  She filed suit
against defendants Sheriff Charles "Doc" Holladay, Randy Morgan, and Shawn Smith in their
individual and official capacities.  Ms. Brown alleges that she was discriminated against on the
basis of her gender when she was terminated from the Pulaski County Sheriff's Office.
Currently before the Court is defendants' motion for summary judgment and request for
qualified immunity (Dkt. No. 11).  Ms. Brown responded (Dkt. No. 18), and defendants replied
(Dkt. No. 21).  For the reasons that follow, defendants' motion for summary judgment is granted
(Dkt. No. 11).

I.      BACKGROUND

The following facts are undisputed unless stated otherwise.[1]  Ms. Brown worked at the
Pulaski County Regional Detention Facility ("PCRDF") from January 5, 2009, until her
termination on April 28, 2010.  Mr. Morgan is the Chief of Detention for the Pulaski County
Sheriff's Office.  Mr. Morgan terminated Ms. Brown based on the authority delegated to him by
Sheriff Holladay.  Ms. Brown contends that Mr. Smith was involved in the decision to terminate

---

[1]  The undisputed facts are taken from Defendants' Statement of Material Facts Not In
Dispute (Dkt. No. 12) and Ms. Brown's Response to Defendants' Statement of Material Facts
Not In Dispute (Dkt. No. 19), unless otherwise noted by specific citation.

her.  Defendants deny this but acknowledge that Mr. Smith recommended Mr. Morgan hold an administrative meeting and attended that meeting in regard to Ms. Brown's termination (Dkt. No. 13, at 2).

On April 17, 2010, Ms. Brown was working in the U-Unit of the PCRDF.  Deon Earnest, an inmate at the PCRDF, was going back to his cell when he stopped at the deputy's station and asked to use a pencil sharpener.  Another deputy, William Owens, was working with Ms. Brown and was at the computer behind the deputy station.  Mr. Earnest told the deputies that he had ten pencils to sharpen.  Ms. Brown noticed that some of Mr. Earnest's pencils were already sharp, so Ms. Brown told Mr. Earnest that he could sharpen two pencils.  Agitated, Mr. Earnest insisted on sharpening all ten pencils.  Ms. Brown then placed the pencil sharpener behind the desk and ordered Mr. Earnest to go to his cell.

Mr. Earnest did not comply with Ms. Brown's order and stated that no one was going to touch him or spray him with "OC spray" (Dkt. No. 19, at 2).  Ms. Brown "started around the deputy station to call for a sergeant, and [Mr.] Owens stood up and started to walk around the other side of the station" (Dkt. No. 19, at 2).  Growing more agitated, Mr. Earnest removed his shirt, told the deputies to "look at his charges," warned them that he was "not playing," threatened that the deputies were "going down tonight" and would "both die" (Dkt. No. 19, at 2).  Mr. Owens then ordered Mr. Earnest to go to his cell.  Mr. Owens reached for his pepper spray.

Ms. Brown called a "Code Blue," which means deputy needs assistance (Dkt. No. 13, at 2-3).  Ms. Brown contends that she was forced to step away from the incident with Mr. Owens and Mr. Earnest to call the Code Blue because another deputy, Mr. Garringer, stationed in the T/U Unit Control Booth, should have made the call but did not do so (Dkt. 19, at 3).  Ms. Brown stated at her termination hearing that, as Mr. Owens was pulling his spray, she was

simultaneously pulling out her radio to call a Code Blue.  Ms. Brown states, however, that by the time she called the Code Blue, Mr. Earnest was already hitting Mr. Owens and had already knocked him down (Dkt. No. 12-7, at 15).

At this time, Ms. Brown came back around to the front of the deputy station.  Mr. Earnest, with the pencils still in his hand, hit Mr. Owens in the face several times.  Mr. Owens fell backwards to the floor with his head propped on a windowsill.  Mr. Earnest stomped his foot on Mr. Owens's face several times, broke Mr. Owens's glasses, and severely injured him.  Mr. Earnest straddled Mr. Owens and punched him.

After calling the Code Blue, Ms. Brown ordered Mr. Earnest to cease his attack and pulled her pepper spray.  At that point, Mr. Earnest discontinued his attack on Mr. Owens, but, when Ms. Brown pointed her pepper spray at Mr. Earnest, Mr. Earnest gained control of Mr. Owens's pepper spray and pointed it at Ms. Brown.  Mr. Earnest threatened Ms. Brown by saying "come on bitch you're next" (Dkt. No. 19, at 2).  Ms. Brown ordered Mr. Earnest to step away from Mr. Owens and come to her position.  Mr. Earnest began moving toward Ms. Brown.  Ms. Brown wanted to get Mr. Earnest away from Mr. Owens.  Ms. Brown did not want to force Mr. Earnest to the ground while he was straddling Mr. Owens because she was afraid doing so would break Mr. Owens's neck.

At this point, Sergeant Patterson came into the unit, and Mr. Earnest stopped advancing toward Ms. Brown.  When Ms. Patterson entered the unit, Ms. Brown was standing by the deputy station near the deputy bathroom, Mr. Earnest was standing by the "outside activity" and Mr. Owens was on the floor between Mr. Earnest's legs (Dkt. No. 19, at 3).  Ms. Brown informed Ms. Patterson that Mr. Earnest was in possession of Mr. Owens's pepper spray.  Mr. Earnest dropped the canister.  Mr. Earnest allowed Ms. Patterson to handcuff him but warned

that "no one is going to touch me" (Dkt. No. 19, at 2).   Mr. Earnest was still straddling Mr. Owens when Ms. Patterson handcuffed him.   Ms. Patterson instructed Ms. Brown to call someone about Mr. Owens.   Ms. Brown called "Central Control," but no one answered (Dkt. No. 19, at 2).   At some point after that, nursing staff entered the unit and began treating Mr. Owens.

In regard to Ms. Brown's contention that she had to call the Code Blue because Mr. Garringer did not, Mr. Garringer was stationed in the T/U Unit Control Booth, which provides a view of both housing units.   When asked about this incident, he reported that he called Ms. Patterson at 5:20 p.m. to report that Mr. Owens and Ms. Brown were talking to Mr. Earnest. According to Mr. Garringer's report of the incident, when he hung up the phone and turned around, he saw the attack.   He asserted in his report that he saw Ms. Brown "standing at the deputy station, [and that she] seemed to be watching and just frozen in place" (Dkt. No. 19, at 3). Ms. Brown asserts that Mr. Garringer's report and the statements therein are false.   Ms. Brown also asserts that Mr. Garringer failed to comply with jail policy that required him "to maintain watch and call a Code Blue immediately upon seeing conflict as [Ms. Brown] described" (Dkt. No. 19, at 3).

At Mr. Morgan's direction, Lieutenant Martin reviewed the videotape captured at the time of the incident and reported that 21 seconds elapsed between the time of the Code Blue call and the time Ms. Patterson entered U-Unit (Dkt. 12-6).

Ms. Brown asserts that she was forced to call the Code Blue because Mr. Garringer did not.   According to Ms. Brown, Mr. Garringer's failure to call the Code Blue "is why [Mr.] Owens got hurt" (Dkt. No. 19, at 4).   Ms. Brown notes that Mr. Garringer was not disciplined. Defendants put forth no evidence in this record to refute that Mr. Garringer was not disciplined over this incident.

On April 22, 2010, Mr. Morgan served Ms. Brown with a notice of possible disciplinary action, which stated that Ms. Brown might be in violation of certain sheriff's office standards of conduct including "aiding other members," "committing unsafe acts or endangering self or others," "displaying competent performances and achieving competent performance results," "knowing, observing and obeying all directives, rules, policies, procedures, practices and traditions" (Dkt. No. 19, at 4).  On April 28, 2010, Mr. Morgan held an administrative meeting with Ms. Brown at which she had an opportunity to explain her actions during the incident.  At that meeting, Ms. Brown stated that she called the Code Blue after Mr. Earnest had already attacked Mr. Owens and knocked him down (Dkt. No. 19, at 5).  In her summary-judgment papers, Ms. Brown does not directly address that statement but asserts the following: Mr. Garringer failed to call the Code Blue; Mr. Garringer's report is false; Mr. Garringer is still employed at the jail; before calling the Code Blue herself, Ms. Brown "looked up at the Tower where Mr. Garringer was supposed to be watching, and he was not;" Mr. Garringer later told Ms. Brown that "he was playing video games and not watching" (Dkt. No. 19, at 5).  At her termination hearing, Ms. Brown stated that Mr. Garringer "saw nothing" and "was on the phone with a sergeant at the time and didn't even realize anything – that there was a code until I called it" (Dkt. No. 12-7, at 20).

Ms. Brown points to a number of male employees of the PCRDF who she alleges are comparators.  Ms. Brown's complaint mentions that there have been male jailers treated more favorably than at least one female jailer, Ms. Wainwright, who is a plaintiff in a separate lawsuit.[2]  In response to the motion for summary judgment, Ms. Brown identifies several other potential comparators.  She identifies Mr. Herron and Mr. Lewis as male employees who

---

[2] *See Wainwright v. Holladay*, No. 4:10-cv-1190-DPM (E.D. Ark. Sept. 7, 2010).

purportedly were treated differently than Ms. Wainwright when all allegedly violated policies (Dkt. No. 20, at 2-3, 8).  Ms. Brown also alleges that Mr. Levine was not terminated when he took a loaded gun into a housing unit (Dkt. No. 20, at 8).  She refers to another deputy, Mr. Lawson, who "committed a felony, yet he was not disciplined in the manner Plaintiff was" (Dkt. No. 18, at 2). Defendants dispute that any of these individuals identified by Ms. Brown are proper comparators (Dkt. No. 21).  The Court will address these allegations in its analysis.

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Id.* at 323. The burden then shifts to the nonmoving party to establish there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Celotex*, 477 U.S. at 331.

## III.     GENDER DISCRIMINATION CLAIM

This Court analyzes discrimination claims asserted pursuant to § 1983 under the burden-shifting framework of *McDonnell Douglas*.  *Clegg v. Arkansas Dept. of Correction*, 496 F.3d 922, 926 (8th Cir. 2007).  Ms. Brown asserts that the *McDonnell Douglas* analysis should not

apply to this case (Dkt. 20, at 11).  This Court rejects her assertion and will apply *McDonnell Douglas*.

To make out a *prima facie* case of gender discrimination, a plaintiff must show that she: "(1) is a member of a protected class; (2) was qualified for her job; (3) suffered an adverse employment action; and (4) alleged facts that give rise to an inference of gender discrimination." *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 460-61 (8th Cir. 2010).  If a plaintiff makes out a *prima facie* case, she "creates a presumption of unlawful discrimination, rebuttable through the showing of a legitimate nondiscriminatory reason for the action." *Tyler v. Univ. of Arkansas Bd. of Trustees*, 628 F.3d 980, 990 (8th Cir. 2011).  Finally, a plaintiff "may still demonstrate the employer's proffered reason was pretextual and unlawful discrimination was a motivating factor in the adverse employment decision." *Id.*

The parties disagree whether Ms. Brown can establish a *prima facie* case of gender discrimination.  Defendants do not dispute that Ms. Brown satisfies the first and third elements of her *prima facie* case, and, for the purposes of their summary-judgment motion, defendants concede that Ms. Brown meets the second element.  The key issue is whether Ms. Brown has presented evidence sufficient to create a genuine issue of material fact as to the fourth element: that is, whether she has alleged facts that give rise to an inference of discrimination.

"A plaintiff can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1019 (8th Cir. 2011) (citing *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039-40 (8th Cir. 2010)).  The Eighth Circuit "has two lines of cases on the standard to determine whether employees are 'similarly situated' at the *prima facie* stage of the *McDonnell Douglas* test." *Pye*,

641 F.3d at 1019 (quoting *Wimbley v. Cashion,* 588 F.3d 959, 962 (8th Cir. 2009)).  The first line of cases "sets a low threshold, requiring only that the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  *Pye*, 641 F.3d at 1019 (internal quotations omitted).  The other line of cases "more rigorously requires that the employees be similarly situated in all respects."  *Id.* (internal quotations omitted).

Here, Ms. Brown relies upon potential comparators Mr. Herron, Mr. Lewis, Mr. Levine, and Mr. Lawson who were involved in other incidents that Ms. Brown contends demonstrate the disparate treatment of women at the PCRDF.  This Court has reviewed the record materials presented regarding Mr. Herron.  The Court notes that the record includes no evidentiary materials regarding Mr. Lewis, Mr. Levine, or Mr. Lawson.  Ms. Brown also cites to Mr. Garringer as a potential comparator at the *prima facie* case stage.

Mr. Garringer was involved in the incident that took place.  Although Ms. Brown and Mr. Garringer were located in different areas of the PCRDF during the incident, the record shows that only Ms. Brown was disciplined following the incident with Mr. Earnest on April 17, 2010.  In short, Ms. Brown was fired because of the deficiencies in her response to the incident and her failure to come properly to the aid of Mr. Owens.  Mr. Garringer, on the other hand, was situated in the control tower and was, at least in part, responsible for monitoring the area in which the incident occurred, according to Ms. Brown.  Ms. Brown asserts that Mr. Garringer was not disciplined for his alleged failure to call a Code Blue.  Ms. Brown alleges that Mr. Garringer should have called a Code Blue "immediately upon seeing the conflict as the Plaintiff described" (Dkt. No. 19, at 3).  Ms. Brown goes so far as to allege that Ms. Garringer's failure to call a Code Blue actually caused the injuries Mr. Owens sustained in the incident.

At this *prima facie* stage of the analysis, and viewed in the light most favorable to Ms. Brown, the Court concludes that Ms. Brown satisfies the requirement "only that the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Pye*, 641 F.3d at 1019.   She has presented evidence sufficient to create a genuine dispute of material fact as to whether the facts alleged give rise to an inference of discrimination thereby establishing her *prima facie* case.   Because the Court concludes that Ms. Brown can establish a *prima facie* case, the Court will proceed through the *McDonnell Douglas* analysis.

Once Ms. Brown establishes a *prima facie* case of discrimination, the burden shifts to defendants to show that there was a legitimate, nondiscriminatory reason for firing her.   "This burden is not onerous."   *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012). Courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."   *Id.* at 955 (internal quotation omitted).   Defendants need only proffer a good-faith reason for their action.   *Id.*   Here, defendants assert that Ms. Brown was terminated in part because of her failure to come to the aid of another officer.   In sum, defendants assert that Ms. Brown was terminated because of her deficient response to Mr. Earnest's attack on Mr. Owens, not because of her gender.   Prior to her termination, Ms. Brown was provided notice of possible disciplinary action (Dkt. No. 12-10) and participated in a meeting with Mr. Morgan that was recorded, transcribed, and witnessed by others (Dkt. No. 12-7).   Mr. Morgan ordered a review of the videotape of the day of the incident, which review documented 21 seconds between the time the Code Blue was called and when Sergeant Patterson entered U-Unit (Dkt. 12-6).   As set forth in a letter she received, Ms. Brown was officially terminated for violating four separate standards of conduct in connection with the April 17, 2010, incident (Dkt.

No. 12-8).  For these reasons, the Court finds that defendants have met their burden to articulate a legitimate, nondiscriminatory reason for terminating Ms. Brown.

Because defendants have articulated a legitimate, nondiscriminatory reason to terminate Ms. Brown, "the presumption of discrimination disappears," and the burden of persuasion shifts back to Ms. Brown "to prove that the proffered justification is merely a pretext for discrimination."  *Id.*  The Eighth Circuit has explained that "[t]here are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc).  First, "[a] plaintiff may show that the employer's explanation is unworthy of credence because it has no basis in fact.  Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer."  *Id.*

Ms. Brown does not argue that defendants' explanation is unworthy of credence because it has no basis in fact.  Instead, to demonstrate pretext, Ms. Brown points to potential comparators outside the protected class who she contends have been treated differently.  She also alleges that the employer deviated from its policies and cites this as a basis for establishing pretext.  *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006).  "In determining whether a plaintiff has met its burden with respect to pretext in a summary judgment motion, a district court is prohibited from making a credibility judgment or a factual finding from conflicting evidence."  *Yates v. Rexton, Inc.*, 267 F.3d 793, 800 (8th Cir. 2001).

The Eighth Circuit has held that, "[a]t the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one."  *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (internal quotation omitted).  A plaintiff "must show that she and the employees outside of her protected group were similarly situated in all relevant

respects." *Id.* (internal quotation omitted).  The potential comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000)).  Finally, "[t]o be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness." *Id.* (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005)).

At the pretext stage, it is Ms. Brown's burden of persuasion to demonstrate that the comparators identified are similarly situated in all relevant respects. *Twiggs v. Selig*, 679 F.3d 990, 993-94 (8th Cir. 2012).  In regard to potential comparators Mr. Herron, Mr. Lewis, Mr. Levine, and Mr. Lawson, given the rigorous analysis applied to comparators at the pretext stage, the Court concludes Ms. Brown has not met her burden even when all record evidence is viewed in the light most favorable to her.

For the Court, it is a closer call regarding Mr. Garringer as a potential comparator at the pretext stage.  The ultimate supervisors for Ms. Brown and Mr. Garringer are the same, Mr. Morgan and Sheriff Holladay (Dkt. No. 12, ¶¶ 2 and 3).  Ms. Brown maintains that the policies in the record apply to "all members of the Pulaski County Sheriff's Office" and that Mr. Garringer, at the time of this incident, was a PCRDF employee (Dkt. No. 12-9, at 1).  The Court notes that Ms. Brown's response to defendants' statement of undisputed facts is verified (Dkt. No. 19, at 5).  Ms. Brown admits that the incident report submitted by Mr. Garringer states he was observing the situation and called Sergeant Patterson to report that Mr. Owens and Ms. Brown were talking to Mr. Earnest (Dkt. No. 12-5).  Although she admits this, she challenges the credibility of Mr. Garringer's report (Dkt. No. 19, ¶¶ 5, 10).

Ms. Brown submits a verified statement claiming that Mr. Garringer should have called the Code Blue but did not and was not disciplined for it.  Aside from her statement, she presents no other support in the record for her contention that Mr. Garringer was not following protocol or policy at the time of this incident.  But there is no record evidence to the contrary.  The Court is aware of the line of cases cited by defendants in which summary judgment has been granted when a discrimination plaintiff has not presented any evidence beyond her own subjective belief that defendants' decision to terminate plaintiff's employment was based on discriminatory animus.  *See Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994) (affirming summary judgment on race-discrimination claims where plaintiff presented no evidence other than his own unsubstantiated allegations in deposition).  *See also Bearden v. Int'l Paper Co.*, 529 F.3d 828, 832 (8th Cir. 2008) ("Plaintiff must offer more than speculation, conjecture, or fantasy in support of claims at summary judgment stage") (citation omitted).  In this case, even when the Court credits Ms. Brown's verified statement and draws all inferences from the record in her favor, the Court concludes for the following reasons she has not met her burden of demonstrating a genuine issue of material fact on pretext.

The parties do not dispute that Ms. Brown was on the ground and directly involved in the April 17, 2010, incident in which Mr. Earnest attacked Mr. Owens, while Mr. Garringer was stationed in a monitoring tower away from the actual incident.  In their reply, defendants argue: "Standard 02, one of four Standards that [Ms.] Brown was charged with violating, states, 'Members shall, during the line of duty, come to the aid of another member when a request or need is made known.'  [Ms.] Brown does not dispute that she failed to comply with Standard 02 or that Deputy Owens was seriously injured. . . . None of these male employees [Ms. Brown cites as comparators] were charged with an act as serious as failing to come to the aid of a fellow

officer, and the violations of policy allegedly committed by these male employees did not lead to physical injury of another person."  (Dkt. 21, at 2).  Ms. Brown admits that, by the time she called the Code Blue, Mr. Earnest was already hitting Mr. Owens and had already knocked him down (Dkt. No. 12-7, at 15).

Because she was on the ground with the incident taking place in front of her and Mr. Garringer was in the monitoring tower, the Court determines distinguishing circumstances exist such that the Court cannot conclude that Mr. Garringer and Ms. Brown were engaged in the same conduct for purposes of considering Mr. Garringer a proper comparator at the pretext stage of this analysis.  Furthermore, based on the materials presented, the Court cannot determine that Mr. Garringer's and Ms. Brown's alleged misconduct were of comparable seriousness.  Ms. Brown cannot demonstrate comparable seriousness by comparing Mr. Garringer's alleged failure to monitor video-surveillance feeds to call another individual to intervene in the situation with her deficiencies in aiding an officer who was being physically attacked in her presence.  The Court is not persuaded that Mr. Garringer's and Ms. Brown's alleged misconduct, even drawing all inferences in Ms. Brown's favor, were of comparable seriousness sufficient to consider Mr. Garringer a proper comparator at the pretext stage.

Ms. Brown also suggests that defendants' reliance on a subjective policy to justify terminating her employment is evidence of discrimination.  "While 'an employer's asserted reliance on subjective factors . . . is to be closely scrutinized for discriminatory abuse,' reliance on such factors by itself is insufficient to establish discrimination."  *Twiggs*, 679 F.3d at 994-95 (internal citations omitted).  There is no evidence defendants used a subjective policy in a discriminatory way, and the policy alone cannot be the basis for Ms. Brown's claim of discrimination.

Ultimately, construing all of the record evidence in the light most favorable to Ms. Brown as the Court is required to do at this point in the litigation and mindful that the standard to prove a comparator relationship at the pretext stage is rigorous, the Court concludes that Ms. Brown has not met her burden of demonstrating that Mr. Garringer, or any of the other alleged comparators, are similarly situated at the pretext stage.  Even assuming that Ms. Brown has made out a *prima facie* case of discrimination, she has failed to present adequate proof to demonstrate a genuine issue of material fact on pretext and to overcome defendants' proffered legitimate, nondiscriminatory reason for terminating her.  Defendants' motion for summary judgment is granted as to Ms. Brown's gender discrimination claims asserted under 42 U.S.C. § 1983. Because the Court grants summary judgment to defendants on these claims, it need not examine the issue of qualified immunity under 42 U.S.C. § 1983.

## IV.    DISCRIMINATION UNDER THE ACRA

According to 28 U.S.C § 1367(c), the Court has discretion to decline to exercise supplemental jurisdiction over remaining state-law claims after it has dismissed all claims over which it has original jurisdiction.  Here, the Court exercises supplemental jurisdiction over Ms. Brown's claims under the ACRA.  Ms. Brown argues that the ACRA requires a rejection of the *McDonnell Douglas* framework, but the Arkansas Supreme Court has consistently applied the *McDonnell Douglas* framework for gender-discrimination claims brought pursuant to the ACRA. *See, e.g.*, *Greenlee v. J.B. Hunt Transp. Servs., Inc.*, 2009 Ark. 506, at 6-7, 342 S.W.3d 274, 278-79; *Flentje v. First Nat'l Bank of Wynne*, 11 S.W.3d 531, 537, 340 Ark. 563, 572 (2000) (applying *McDonnell Douglas* to plaintiff's gender-discrimination claim under the ACRA).  *See also Moyer v. DVA Renal Healthcare, Inc.*, 368 Fed. App'x 714, 716 (8th Cir. 2010) (noting that "[a]s guidance on ACRA discrimination claims, the Arkansas Supreme Court draws upon Title

VII and the federal cases interpreting it" and then, absent direct evidence of discrimination, applying the burden-shifting framework of *McDonnell Douglas* to determine whether plaintiff had created an inference of unlawful discrimination).  Because neither the Eighth Circuit nor the Arkansas Supreme Court has done so, this Court is not persuaded that it should reject the *McDonnell Douglas* framework when considering Ms. Brown's claims under the ACRA. Having determined that defendants are entitled to summary judgment on Ms. Brown's claims under 42 U.S.C. § 1983, the Court concludes defendants also are entitled to summary judgment on Ms. Brown's gender-discrimination claims under the ACRA.

*   *   *

For these reasons, defendants' motion for summary judgment is granted, and defendants' request for qualified immunity is denied as moot (Dkt. No. 11).  Ms. Brown's gender-discrimination claims under 42 U.S.C. § 1983 and the ACRA are dismissed with prejudice. Judgment will be entered accordingly.

SO ORDERED this the 14th day of January, 2013.

_____
Kristine G. Baker
United States District Judge